UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID LEE GALESKI, JR.,

                         Plaintiff,            Civil Action No. 17-12495

      v.                               Honorable Robert H. Cleland
                                           Magistrate Judge David R. Grand

DONALD RICUMSTRICT,
ARTHUR THOMAS, and
RICHARD ENDERS,

                         Defendants.

_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [47]

Before the Court is a Motion for Summary Judgment filed by Defendants Donald Ricumstrict, Arthur Thomas, and Richard Enders (collectively "Defendants") on February 22, 2019. (Doc. #47). *Pro se* plaintiff David Galeski ("Galeski"), an incarcerated person, filed a response to this motion on March 14, 2019, and Defendants filed a reply on March 27, 2019. (Docs. #49, #50).

An Order of Reference was entered on September 7, 2017, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b). (Doc. #11). Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody. *See* E.D. Mich. L.R. 7.1(f). Here, the Court finds that the facts and legal issues are adequately presented in the briefs and on the record and declines to order a hearing at this time.

## I.    REPORT

### A.    Background

Galeski is a Michigan Department of Corrections ("MDOC") prisoner who is currently confined at the Bellamy Creek Correctional Facility ("IBC") in Ionia, Michigan. He brings this

civil rights action pursuant to 42 U.S.C. § 1983, alleging that Defendants failed to provide reasonable measures to guarantee his safety, in violation of the Eighth Amendment.  (Doc. #1).

At the time of the events at issue in his complaint, Galeski was housed at the Gus Harrison Correctional Facility ("ARF") in Adrian, Michigan.  The named defendants are current or former MDOC employees who worked at ARF during the relevant period: specifically, Ricumstrict was and is ARF's Deputy Warden; Thomas was and is a residential unit manager ("RUM") at ARF; and Enders was a prison counselor for "Unit 5" – the unit in which Galeski was housed while at ARF – until his retirement from the MDOC in February 2018.  (Doc. #47 at 12).

On December 1, 2017, Defendants filed a motion for partial summary judgment, arguing that Galeski had failed to administratively exhaust some of his claims, as required by the Prison Litigation Reform Act.  (Doc. #17).  On April 2, 2018, this Court entered a Report and Recommendation ("R&R") to grant in part and deny in part that motion.  (Doc. #23).  On August 3, 2018, the R&R was adopted over Galeski's objections.  (Doc. #29).  Galeski's remaining Eighth Amendment claim is based on two distinct allegations: (1) that Ricumstrict and Thomas failed to protect him from an assault by inmate Kirk Knight ("Knight") on February 27, 2017; and (2) that all three Defendants failed to protect him from an assault by inmate Johnny Beasley ("Beasley") on March 4, 2017.  (Docs. #23, #29).

### B.    The Relevant Facts

Defendants' summary judgment motion is supported by their own individual affidavits, affidavits from prisoners Knight and Beasley, and several documentary exhibits.  In response, Galeski submitted his own affidavit and documentary evidence.  The evidence reflects both undisputed facts, and some disputed ones, though, as discussed below, none of the latter preclude

the Court from granting Defendants' instant motion.

       *1.    Undisputed Facts*

      Galeski was transferred from a different prison to ARF on June 14, 2016, to complete a Residential Treatment Program ("RTP").  (Doc. #49 at 16).  On February 7, 2017, Galeski requested protection (at least) from inmate Knight by submitting a written kite, which was received by Enders.[1]  (Docs. #49 at 26, ¶5; #47-2 at ¶6).  Enders received this kite and notified Thomas of Galeski's request.  (Docs. #47-2 at ¶¶6, 9; #47-3 at ¶10).  Clearly, action was taken on account of Galeski's kite, because the very next day, February 8, 2017, he was placed on "in-cell" status pending an interview.[2]  (Docs. #49 at 26, ¶7; #47-3 at ¶10).  Galeski admits that he was irritated by his in-cell status.  (Docs. #49 at 26, ¶11; #47-5 at 2).

      On February 9, 2017, Thomas and Ricumstrict interviewed Galeski about his protection request.  (Docs. #49 at 26, ¶¶13-14; #47-3 at ¶11; #47-4 at ¶7).  Galeski requested protection (at least) from Knight because Knight had threatened him.[3]  (Docs. #47-3 at ¶13; #47-4 at ¶9; #49 at 26, ¶¶14-15).  During the interview, the purpose of which was "to find out who the prisoner is seeking protection from and why they believe they need protection," Ricumstrict and Thomas completed a Form CSJ-686, a Request for Protection/Investigation Report (the "Investigation Report").  (Docs. #47-3 at ¶9; #49 at 54).  Under the heading, "Reason Protection is Being Requested:" Thomas wrote, "Prisoner [Galeski] states that he is in fear for his life.  He states that he and 892904 Burns were having a conversation that prisoner Knight 883566 didn't like and he

---

[1]  As discussed below, whether Galeski's kite referenced needing protection from only Knight, or from both Knight and Beasley, is disputed, and the kite is not in the record.

[2] A prisoner requesting protection is to be placed on in-cell status or moved to segregation for protection until an interview is conducted.  (Doc. #47-3 at 3, ¶7).  A prisoner on in-cell status is not allowed out of his cell without a staff escort.  (*Id.*).

[3] As discussed below, whether Galeski stated during the interview that he was seeking protection from only Knight, or from both Knight and Beasley, is disputed.

threatened to have the 'Mobites stab him.'"  (Doc. #49 at 54).  Further, in the "Investigation Narrative" section, Thomas wrote, "Prisoner was interviewed on 2/9/17 by Deputy Warden Ricumstrict and RUM Thomas.  Prisoner stated that it was a misunderstanding and he is ok now.  He agreed that he can still be housed in 5 Block."  (*Id.*).  Finally, under the heading "SCC Review and Decision," the Report states: "Prisoner agrees that he can return to 5 Block RTP program" and it is signed by both Thomas and Ricumstrict.  (*Id.*).[4]

Enders avers in his affidavit that, following this interview, Galeski requested to be removed from in-cell status.  (Doc. #47-2 at ¶12).  Galeski does not challenge this statement by Enders.  To the contrary, despite recognizing that he was placed on in-cell status "for my protection request," Galeski claims that he "was frustrated for being placed on In-cell status because I felt punished ...."[5]  (Doc. #49 at 26, ¶11).  After the February 9, 2017 interview, Galeski was removed from in-cell status, but he was not transferred to another unit as he alleges he requested.  (*Id.* at 26-27, ¶18).

Galeski does not allege that he experienced any problems with Knight, Beasley, or anyone else during the next two-plus weeks.  It is also undisputed that Galeski made no further requests for protection during this time to Enders, Ricumstrict, or Thomas.  (Docs. #47-2 at ¶¶13-14; #47-3 at ¶¶16-18; #47-4 at ¶¶12, 15-16).

On February 27, 2017, Knight assaulted Galeski, striking him "several times on the right side of the head and face with clenched fists."  (Doc. #49-1at 8; *see also* Docs. #49 at 27, ¶26; #47-8 at ¶17).  A registered nurse examined Galeski and "found a reddened right eye, small

---

[4] Again, these are the Investigation Report's written contents; Galeski disputes that they accurately reflect what he said during the interview.

[5] In his affidavit, Galeski asserts, "In my request for protection I stated Mr. Knight and Mr. Beasley were harassing me and that Mr. Knight told me that his religious brothers were going to stab me."  (Doc. #49 at ¶6).  In light of this factual assertion, it is unclear what other immediate means existed to protect Galeski from the specific harm he expressed concern about.

superficial lacerations behind the right ear, and a small bruise with swelling to the lower right ear lobe." (Doc. #49-1 at 10). The nurse cleaned the lacerations and Galeski returned to his cell. (*Id.*). Knight received a misconduct violation, received a 30-day loss of privileges, and was moved to a different cell wing away from Galeski. (Doc. #47-8 at ¶22).

After the assault by Knight, Galeski did not make a request for protection from Beasley. (Docs. #47-2 at ¶¶13-14; #47-3 at ¶¶16-18; 47-4 at ¶¶12, 14-15). Instead, on March 1, 2017, Galeski completed a "Prisoner/Parolee Grievance Form" addressed only to the situation with Knight:

> I requested protection from prisoner Knight #833566 on 2-8-17 and was told by RUM Thomas and Deputy Warden Ricumstrict to ignore the situation and it would go away. On 2-27-17 I was then physically assaulted by prisoner Knight #833566 causing injuries. RUM Thomas and Deputy Warden Ricumstrict did nothing to prevent the threat of assault and lied on my protection request reporting that I said it was a "misunderstanding." Thus, RUM Thomas and Deputy Warden Ricumstrict kept me in a hostile situation that ended up causing me physical harm.[6]

(Doc. #49-1 at 6).

On March 4, 2017, Beasley assaulted Galeski by "forcefully shov[ing]" him "off of his chair and strik[ing] him several times in the face and head area with closed left and right fists." (Docs. #49-1 at 12; #47-10 at ¶12; #49 at ¶29). Galeski "received a laceration to his right cheek with swelling and bruising visible" and was "sent to Bixby Medical Center for further evaluation." (Doc. #49-1 at 12). Beasley was charged with "Assault Resulting in Serious Physical Injury," receiving a misconduct violation for the assault and a 30-day loss of privileges. (Docs. #49-1 at 12; #47-10 at ¶17). Galeski was transferred to another facility before he could be interviewed regarding his grievance. (Doc. #49 at 64). He then filed this lawsuit.

---

[6] In his grievance, Galeski does not mention having including Beasley in his "2-8-17" protection request. (*Id.*). Nor does he express a concern about needing protection from Beasley in the future. (*Id.*). Indeed, the grievance makes no reference to Beasley whatsoever.

2.    *Disputed Facts*

As noted above, certain facts remain in dispute.  First, there is some disagreement regarding whether, in his February 7, 2017 kite, Galeski voiced any concern about Beasley. Galeski avers that his kite requested protection from both Knight and Beasley.  (Doc. #49 at 25, ¶¶5-6).  Defendants do not directly address the kite's specific contents in their affidavits, and the kite could not be located.  Defendant Enders, who avers that he "received a kite from Galeski asking for protection," does not identify the person or persons from whom Galeski sought protection in the kite.  (Doc. #47-2 at ¶6).  However, Defendant Thomas avers that, after Galeski's kite was forwarded to him, he, Ricumstrict, and Galeski discussed "the events that led to [Galeski] requesting protection **from prisoner Knight** . . ."  (Doc. #47-3 at ¶13) (emphasis added).  Thus, there appears to be a question about whether, in his kite, Galeski sought protection from Knight and Beasley, or only from Knight.  Because the Court must construe the disputed facts in the light most favorable to Galeski, the Court will assume for purposes of this motion that his kite referenced both Knight and Beasley.

There are also questions about what transpired during the February 9, 2017 interview between Ricumstrict, Thomas, and Galeski.  Both Thomas and Ricumstrict explain that, during this interview, Galeski admitted that Knight had threatened him because he was having a sexual conversation with another inmate.  (Docs. #47-3 at ¶13; #47-4 at ¶10).  Both Thomas and Ricumstrict further aver that Galeski did not request protection from Beasley during the interview.  (Docs. #47-3 at ¶16; #47-4 at ¶12).  Galeski, on the other hand, avers that, "[d]uring the interview on February 9, [he] stated to Deputy Warden Ricumstrict and RUM Thomas that [he] was threatened multiple times by Mr. Knight and Mr. Beasley," that he "was in fear of getting stabbed by either Mr. Knight or his religious brothers," and that he "never stated that [he]

6

was having sexual conversations with other inmates or that [he] was 'talking gay shit with Mr. Burns.'"  (Doc. #49 at 26, ¶¶14-16).

Additionally, the parties dispute whether, during the interview, Galeski dismissed his need for protection as reflected in the Request for Protection/Investigation Report.  Both Ricumstrict and Thomas aver that Galeski stated that "he did not need protection."  (Docs. #47-3 at ¶14; #47-4 at ¶11).[7]  Galeski attests, however, that during the interview, he "never stated that the threats were a misunderstanding or that [he] no longer needed protection" and that he "requested to be moved to Unit 4."  (Doc. #49 at 26, ¶¶17-18).  Again, taking the disputed facts in the light most favorable to Galeski, the Court will assume for purposes of this motion that during his interview with Ricumstrict and Thomas, Galeski made the statements *he* alleges and did not make the statements that Ricumstrict and Thomas attribute to him.

The parties also offer differing explanations for the assaults by Knight and Beasley.  In support of their summary judgment motion, Defendants take the unusual step of offering affidavits from the two assailants, Knight and Beasley, in which each comments on the reasons why he assaulted Galeski.  Knight avers in his February 20, 2019 affidavit that although, beginning in late January 2017, he and Galeski had had some "verbal confrontations" about Galeski openly discussing his relationships with others, the February 27, 2017 assault was the

---

[7] As further support for their position, Defendants cite a "Witness Statement CSJ-487" form dated March 1, 2017, which contains the following statement, purportedly made by Galeski to a hearing officer about the situation with Knight: "I had no issue with him, 3 wks ago we were in an argument that was settled.  I apologized.  I have no idea why he hit me."  (Doc. #47-9 at 2). Galeski claims that he does not remember making the statement, and that he neither wrote the statement that appears on the form, nor signed the form.  (Doc. #49 at 28, ¶¶31-32).  The "hearing officer" who transcribed Galeski's purported statement is not identified, and Defendants did not authenticate this record.  Although a party's oral statements are party admissions, and therefore not hearsay, the statement at issue here is contained within a document that is hearsay.  Accordingly, with no showing of any hearsay exception that applies to the document, and in light of Galeski's objection, the Court cannot consider it in ruling on Defendants' summary judgment motion.  Fed. R. Civ. P. 56(c)(2).  And, even if the Court could consider the document, Galeski disputes its contents.

result of Galeski's teasing him and threatening him the night before. (Doc. #47-8 at ¶¶12-21). Indeed, Knight unequivocally asserts that he assaulted Galeski "because of the events that happened the night [of February 26, 2017] . . . [and not] because of any event that occurred on February 8, 2017." (*Id.* at ¶¶20-21). Galeski avers in his affidavit that he "never harassed, degraded, threatened, or 'teased' Mr. Knight or Mr. Beasley." (Doc. #49 at 27, ¶¶24, 25). Galeski then states, in wholly conclusory fashion, and without a proper foundation, that Knight assaulted him on February 27 "because of the previous threats I reported to MDOC officials on February 9, 2017." (Doc. #49 at ¶26).

Beasley also describes in an affidavit the circumstances leading to his assault of Galeski. (Doc. #47-10).[8] He avers that Galeski's cell was across the hall from his, and that he overheard Galeski "having a sexual conversation with another prisoner." (*Id.* at ¶10). Beasley further avers that he later overheard Galeski "talking about me" with that other prisoner, and asked him to stop. (*Id.* at ¶¶12-16; *id.* at 8). Beasley claims that Galeski continued "talking about me," and that because "it continued, I hit him." (*Id.* at 10). Beasley specifically avers that his altercation with Galeski on March 4, 2017, "had nothing to do with Galeski's fight with Prisoner Knight or any verbal altercation that took place [around the time Galeski submitted his kite protection request] on February 8, 2017." (*Id.* at ¶14). Beasley reiterated that that he hit Galeski only "because he was talking about me, not because of any event that occurred on or around February 8, 2017." (*Id.* at ¶16). Galeski avers that he never "harassed, degraded, threatened, or 'teased' . . . Mr. Beasley." (Doc. #49 at 27, ¶24). He also denies ever having "any sexual conversations through the cell doors," as Beasley claims to have overheard. (*Id.* at ¶21).

### B. Standard of Review

---

[8] Beasley specifically incorporates into his affidavit (and swears to the accuracy of) statements that he made in his own writing in a Misconduct Report (attached to his affidavit) that was prepared shortly after the March 4, 2017 assault. (*Id.* at ¶15; *id.* at 10).

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted). Generally, self-serving affidavits, alone, are not enough to create an issue of fact sufficient to survive summary judgment. *See McGee v. CCLA 9 LLC*, No. 14-14897, 2016 WL 612731, at *4 (E.D. Mich. Feb. 16, 2016) (citing *Lowe v. Hamilton Cty. Job & Family Servs.*, No. 1:05CV117, 2009 WL 818960, at *15

(S.D. Ohio Mar. 27, 2009) aff'd sub nom. *Lowe v. Hamilton Ct. Dep't of Job & Family Servs.*, 610 F.3d 321 (6th Cir. 2010)).  And, a mere scintilla of proof or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.  *See Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 284 (6th Cir. 2015).  *See also Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) ("The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].");  *Anderson*, 477 U.S. at 251.  In other words, a genuine issue for trial exists only "if the Court finds a jury could return a verdict, based on 'sufficient evidence,' in favor of the nonmoving party; evidence that is 'merely colorable' or 'not significantly probative,' however, is not enough to defeat summary judgment."  *Anderson*, 477 U.S. at 249-50.

## C.    Deliberate Indifference Standards

The Eighth Amendment "requires that inmates be furnished with the basic human needs, one of which is reasonable safety."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (internal quotation omitted).  Prison officials have a duty to protect prisoners from violence at the hands of other prisoners, and officials may be held liable if they know of and disregard an excessive risk to an inmate's health or safety.  *See Farmer v. Brennan*, 511 U.S. 825, 833, 837 (1994).

To sustain a claim under the Eighth Amendment for a prison official's failure to provide protection from danger, an inmate must show that the official was deliberately indifferent to a "substantial risk of serious harm."  *Id*. at 828.  Deliberate indifference is a "stringent standard of fault …."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  To establish deliberate indifference, a plaintiff must satisfy both an objective and subjective component.  *Farmer*, 511 U.S. at 834, 114

S.Ct. 1970.   Under the objective component, a plaintiff must show that he was exposed to a "substantial risk of serious harm" to his safety.  *Id*.

The subjective component can be broken down into three discrete questions: (1) whether a defendant was "aware of facts" from which he could draw an inference that the plaintiff was exposed to a "substantial risk of serious harm"; (2) whether the defendant actually drew the inference; and (3) whether the defendant disregarded the risk.  *Mangum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017) (quoting *Farmer*, 511 U.S. at 837).   A plaintiff may satisfy the subjective component through ordinary methods of proof, "including inference from circumstantial evidence[.]"  *Farmer* 511 U.S. at 842.

Further, prison officials may defend against claims of deliberate indifference by showing "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  *Id.* at 844.  A prison official may also be "free from liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted."  *Id.*

To prevail on his Section 1983 claim, Galeski "must show a serious 'failure to protect from risk of harm' caused by a prison official acting with 'deliberate indifference to inmate health or safety.'"  *Cooper v. Szostak*, No. 13-14246, 2015 WL 5317268, at *5 (E.D. Mich. Sept. 9, 2015) (quoting *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010)).   Thus, merely showing that a defendant acted with deliberate indifference is not enough to sustain a claim. Rather, the inmate must "prove by a preponderance of the evidence that the defendant's conduct caused his harm."  *Hickerson v. Koepp*, Nos. 95-1890, 95-1982, 1997 WL 56961, at *3 (6th Cir. Feb. 10, 1997).  At the same time, "[a]n action need not be the sole cause of an injury to be the

proximate cause . . . It is enough that the act complained of was a substantial factor in bringing about the plaintiff's injury and was at least one of the causes without which the injury would not have occurred.  Thus, to show proximate cause the plaintiff needs to establish that the wrongful act was a substantial factor in producing his injury."  *Id.* at *4.

With all of the above standards in mind, it is clear that although some factual questions exist, including about the contents of Galeski's February 7, 2017 kite, and what transpired during the February 9, 2017 meeting between him, Ricumstrict, and Thomas, Galeski nonetheless has failed to present sufficient evidence to raise a material question of fact as to whether Defendants can be held liable for deliberate indifference with respect to the assaults he suffered on February 27, 2017 and March 4, 2017.  Accordingly, Defendants' motion for summary judgment should be granted.

**D.    Analysis**

*1.    Defendant Enders*

Even as alleged by Galeski, Defendant Enders had very limited involvement in the facts of this case.  Essentially, Galeski's only allegations against Enders are that on February 7, 2017, Galeski gave Enders his kite seeking protection, and that Enders, in light of his "supervisory" authority, should have done more than simply pass it along to Thomas.  In particular, Galeski asserts, "It is also Defendant Enders [sic] duty to prepare a report out of available files and databases regarding relevant information responsive to my protection request.  Enders admitted that none were found [] but this is clearly not true as I can provide the court at least 6 prior Protection requests that have been documented."  (Doc. #49 at 19).  Similarly, in his affidavit filed in opposition to Defendants' summary judgment motion, Galeski's sole averment with respect to Enders is that Enders knew of his protection request and was obligated to generate a

Special Problem Offender Notice ("SPON") to prevent further targeting or retaliation.  (Doc. #49 at 28, ¶33).  Galeski attached to his response the MDOC Policy Directive relating to a SPON. (Doc. #49-1 at 34-36).  This document states, in relevant part: "All staff are responsible for initiating a SPON when specific reliable information is brought to their attention which warrants issuance pursuant to this policy….  Examples of circumstances under which a SPON is to be issued include the following:  1.  When there is a specific act or threat of violence to or by an offender…." (*Id.* at 34).  Having carefully reviewed the parties' arguments and evidence as to Enders, the Court finds that he is entitled to summary judgment on Galeski's deliberate indifference claim.

In his affidavit, Enders states that, as a prison counselor, he has limited duties, which include, "handling prisoner files, processing transfers, reviewing security classification level scores …." (Doc. #47-2 at 3, ¶4).  Enders states that in his role, he receives many inmate kites seeking protection, that he received Galeski's kite, that he passed that kite on to the RUM, and that he has no involvement in the protection interviews.  (*Id.* at 3-4, ¶¶6, 9, 10).  Galeski does not dispute any of this, and instead seems to argue that Enders still should have done more than simply pass the kite along, including prepare a SPON.  This argument fails for three reasons.

First, it is undisputed that upon receiving Galeski's kite, Enders acted promptly, if not immediately, to ensure that Galeski's safety concerns were being addressed.  He ensured that Galeski was placed on "in-cell" status right away, and he brought Galeski's concerns to the attention of the ARF officers with the responsibility for considering such protection requests. These undisputed facts make clear that Galeski cannot satisfy the subjective component of his claim as to Enders.  In short, Enders' conduct in response to learning of Galeski's concerns completely belies any notion that he "disregarded" the fact that Galeski faced a "substantial risk

of serious harm." *Mangum*, 674 F. App'x at 537.

Second, Galeski has not presented any evidence from which one could find that the outcome of his interview with Ricumstrict and Thomas would have been any different had Enders prepared a SPON or done the kind of research that Galeski suggests should have been done.[9]  Galeski thus failed to raise a material question of fact that Enders' failure to prepare a SPON caused him to suffer any injury.

Finally, the law is clear that merely failing to follow an internal policy or procedure does not constitute deliberate indifference.  *See Atkins v. Vadlamudi*, No. 07-10547, 2008 WL 1795023, at *6 (E.D. Mich. Mar. 18, 2008) ("Although prison officials apparently concede that ATF staff did not comply with the procedural requirements of MDOC's Policy Directive [], it does not follow that the mere failure to adhere to MDOC policy amounted to a constitutional violation.") (citing *Sweeton v. Brown*, 27 F.3d 1162, 1164 (6th Cir. 1994) (prison regulations "do not create an independent federal due process liberty interest or right in the prisoner.")); *Nelson v. Melton*, No. 2:12-0120, 2013 WL 6255381, at *5 (M.D. Tenn. Dec. 4, 2013), report and recommendation approved, No. 2:12-CV-0120, 2014 WL 576188 (M.D. Tenn. Feb. 11, 2014)

---

[9] As noted above, Galeski attached to his response brief a number of his prior requests for protection, and he seems to suggest that had these been located, and had the information contained therein been incorporated into a SPON, a different outcome would have resulted. (Docs. #49 at 19; #49-1 at 38-43).  This argument fails, as it is based on multiple layers of speculation unsupported in the record.  Indeed, Galeski has not pointed to any particular portion(s) of these prior requests that support his argument.  Moreover, these requests predate the time in question by a number of years, none of them appear to reference Knight or Beasley, and some were denied as being unfounded.  (*See, e.g., id.* at 39 ("[Galeski] will not give specific names or threats."); 40 ("[Galeski] would not tell staff the identity of the prisoner that he had been fighting with…. Prisoner was assaulted.  Initially he says it was because he was being pressed for sex.  At the interview he says it was over a pair of shoes.  Prisoner lacks credibility."); 41 ("At first [Galeski] said two or three prisoners were involved, then stated that it involved the whole unit….  He was denied [a request to move bunks] as [] he did not meet the requirements at that time.")).  Moreover, the mere fact that Galeski was permitted to move prisons or units in 2012, 2013, or 2014 based on years' old protection requests regarding unspecified prisoners (*see, e.g., id.* at 41-42) does not establish that he was entitled to any particular level of protection in February 2017 at ARF.

("The mere failure of a prison official to follow an internal prison policy or state law is not sufficient to support a constitutional claim under Section 1983.") (citing *Black v. Parke*, 4 F.3d 442, 448 (6th Cir. 1993); *Barber v. City of Salem, Ohio*, 953 F.2d 232, 240 (6th Cir. 1992)). Thus, even if under MDOC policy Enders should have filed a SPON, or prepared some other report, his failure to do so is not an independent basis for finding that he acted with deliberate indifference.[10]

For all of these reasons, Enders is entitled to summary judgment on Galeski's deliberate indifference claim.

### 2. Defendants Thomas and Ricumstrict

To begin with, Defendants Thomas' and Ricumstrict's position that Galeski (1) initially only requested protection from Knight (rather than from both Knight and Beasley), and (2) advised them during the February 9, 2017 interview that he no longer needed protection, is consistent with some of the documentary evidence in the record.[11]  But, Galeski, in a sworn affidavit based on his own first-hand knowledge and participation, directly disputes both of these points.  (Doc. #49 at 26, ¶¶14-17).  Accordingly, as noted above, the Court must assess Defendants' summary judgment motion assuming Galeski's version of those facts to be true. *See Presidential Facility, LLC v. Debbas*, No. 09-12346, 2011 WL 6153693, at *3 (E.D. Mich. Dec. 12, 2011) (citing *Velazquez–Garcia v. Horizon Lines of P. R., Inc.*, 473 F.3d 11, 14-15 (1st Cir. 2007) for its reasoning that "while a party's own affidavit may be 'self-serving,' the fact it is based on first-hand knowledge is sufficient to defeat a motion for summary judgment").

---

[10] To the extent Galeski advances similar claims related to Defendants Thomas and Ricumstrict about their alleged failure to follow "MDOC Policy" (*see, e.g.*, Doc. #49 at 20 ("Ricumstrict admits he didn't follow MDOC policy of issueing [sic] a SPON . . .")), those claims fail as well.

[11] For instance, in his grievance, Galeski wrote that he "requested protection from prisoner Knight," while making no reference to Beasley.  (Doc. #49-1 at 6).  The Investigation Report indicates that Galeski initially requested protection only from Knight, and then stated during the interview that his concern was "was a misunderstanding and he is ok now." (Doc. #49 at 54).

But, even assuming the truth of Galeski's version of the events through the February 9, 2017 interview, and the removal of his in-cell status on that date, the Court still finds that Defendants Thomas and Ricumstrict are entitled to summary judgment on Galeski's failure-to-protect claim.  In short, Galeski failed to raise a material question of fact that the decision by Defendants Ricumstrict and Thomas to not separate Galeski from Knight and/or Beasley was the proximate cause of the assaults that occurred on February 27, 2017 and March 4, 2017.

As the Sixth Circuit explained in *Hickerson*, the plaintiff in a failure to protect case:

> … must establish that the defendant's constitutional violation was the proximate cause of his injury.  An injury is proximately caused by an act when it appears from the evidence in the case that the defendant's conduct was a substantial factor in bringing about the plaintiff's harm, and no rule of law relieves the defendant from liability because of the manner in which his conduct resulted in the harm.  The burden of establishing proximate cause lies with the plaintiff, who must prove by a preponderance of the evidence that the defendant's conduct caused his harm.

*Hickerson*, 1997 WL 56961, at *3 (internal citations omitted).  "[A]lthough the question of proximate causation in a section 1983 action is sometimes for the court and sometimes for the jury, the court decides whether reasonable disagreement on the issue is tenable." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (citing *Springer v. Seaman*, 821 F.2d 871, 876-77 (1st Cir. 1987)).

Analysis of *Hickerson* makes clear that summary judgment is warranted on causation in this case.  There, Hickerson was an inmate who had been watching a particular television program with other inmates.  When the area became loud, Hickerson went into the office that housed the remote control to attempt to increase the volume.  There, he met a guard, defendant John Koepp; Koepp told Hickerson he would adjust the volume, but instead, he switched the channel to a children's show.  When a group of irate inmates confronted Koepp, he specifically blamed Hickerson.  Hickerson was "threatened continually for a week" and then severely beaten.

The district court dismissed the case, finding that even though Koepp could be said to have acted with deliberate indifference, Hickerson could not show that those actions were the proximate cause of the subsequent assault against him due to a number of facts, including: (1) the assault occurred a week after the television incident; and (2) "Hickerson's failure to ask for protective custody after the TV room incident." *Id.* Although the Sixth Circuit ultimately rejected the district court's specific reasoning, it did not conclude that a defendant who acts with deliberate indifference cannot be entitled to summary judgment as to the issue of causation. To the contrary, the Sixth Circuit suggested it was appropriate to carefully examine the evidence to evaluate whether a material question of fact exists as to whether the defendant's alleged conduct could be characterized as a proximate cause of the plaintiff's injury.

With this framework in mind, a number of key undisputed facts show that Galeski cannot meet the required evidentiary burden of proof on the issue of causation. For one, although Knight's cell was in the immediate vicinity of Galeski's, his assault on Galeski took place almost three weeks after Galeski's in-cell status was removed. The timing alone calls into question the connection between Galeski's release from in-cell status and the assault. Beasley, too, was in the same cell block, and his assault was an additional week removed from Galeski being removed from in-cell status. Yet, this is hardly the only evidence showing the absence of the necessary causal chain.

Unlike in *Hickerson*, where the plaintiff had been "threatened continually for a week" between the TV incident and the assault, here, Galeski does not allege that any threats were made against him during the period between the removal of his in-cell status on February 9, 2017, and the assault by Knight on February 27, 2017. Indeed, Galeski does not dispute Defendants' assertions that after his in-cell status was removed, he never requested protection or

expressed a concern about his safety.  (Docs. #47-2 at ¶¶ 13-14; #47-3 at ¶¶ 16-18; #47-4 at 14-16).  He did not seek protection from Beasley even after Knight's assault.  (*Id.*).

Additionally, a significant distinction exists between Galeski's conduct after his in-cell status was removed, and Hickerson's conduct after the TV incident.  In *Hickerson*, the Sixth Circuit wrote, "[Koepp] asserts that Hickerson's failure to ask for protective custody after the TV room incident suggests he was not afraid of being injured.  But this reason is disingenuous. Hickerson was so afraid of being injured that he made an oral request for a transfer rather than ask for protective custody."  *Hickerson*, 1997 WL 56961, at *3.  In other words, the Sixth Circuit did not find that it would be immaterial if Hickerson had not sought protection during the interim period; rather, it focused on the fact that Hickerson had sought the *greatest* level of protection in the form of a transfer.  Here, in contrast, it is undisputed that at no point between Galeski's in-cell status being removed on February 9, 2017, and Knight's assault on February 27, 2017, did Galeski submit any form of protection request or voice any concern about his safety.  It is also undisputed that despite asserting that the handling of his initial protection request was essentially a farce from the outset, Galeski did not file a grievance about the matter until *after* Knight assaulted him about three weeks later.  (Doc. #49-1 at 6).  And, even after Knight's assault, the undisputed evidence is that Galeski still did not raise any concern about Beasley, in any form, oral or written.  (*Id.*; #47-2 at ¶¶ 13-14; #47-3 at ¶¶ 16-18; #47-4 at 14-16).[12]

---

[12] While all of the foregoing is sufficient to show Defendants' entitlement to summary judgment on the issue of causation, one additional distinction between this case and *Hickerson* (and just about any other failure-to-protect case the Court has seen) is worth noting.  Here, Defendants attached to their summary judgment motion affidavits from the assailants in question – Knight and Beasley – both of whom aver that their respective assaults against Galeski had nothing whatsoever to do with anything that happened weeks earlier, but rather occurred because of independent events that took place on or around the dates of the assaults.  Knight avers in his affidavit that although, beginning in late January 2017, he and Galeski had had some "verbal confrontations" about Galeski openly discussing his relationships with others, the February 27, 2017 assault was a result of Galeski teasing him and threatening him the night before.  (Doc. #47-8 at ¶¶12-21).  Indeed, Knight unequivocally asserts that he assaulted Galeski "because of the events that happened the night [of February 26, 2017] . . . [and not] because of any event that occurred on February 8, 2017."  (*Id.* at ¶¶20-21).  Although Galeski, avers in his affidavit that he "never harassed, degraded, threatened, or 'teased' Mr. Knight or Mr. Beasley" (Doc. #49 at 27, ¶¶24-25), Galeski lacks a proper foundation for his assertion that Knight assaulted him on February 27 "because of the previous threats I

All of the foregoing facts amply distinguish Galeski's case from *Hickerson*, and show that Thomas and Ricumstrict are entitled to summary judgment as to the issue of causation. Other case law also supports this conclusion.  The closest case factually that the Court could find is *Stallworth v. Graham*, No. 4:14-cv-00134, 2015 WL 4756348 (N.D. Ala. Aug. 11, 2015).  In that case, on October 14, 2013, the inmate plaintiff complained to a guard in writing that he was concerned his cellmate would attack him, and asked to be moved to a different location.  The plaintiff and the guard talked three days later, and the plaintiff reiterated his concerns.  The guard refused to move the plaintiff, and told him he (the plaintiff) would need to speak to the "Captain."  On November 1, 2013, the plaintiff's cellmate stabbed him in the shower with a homemade knife.  The plaintiff sued the guard under Section 1983, alleging deliberate indifference in failing to protect him from his cellmate.  In granting summary judgment for the guard, the court noted the guard had acted properly "per prison policy" in referring the plaintiff to the "Captain."  *Id.*, at *4.  Importantly, though, the court went on to emphasize that "the passage of time between the plaintiff's October 17, 2013, conversation with [the guard] and the events of November 1, 2013, coupled with the lack of evidence that he consulted Captain Sanders or had any further conversation with [the guard] in the interim, demonstrate that the plaintiff's injuries were proximately caused by factors other than any act or failure to act on the part of [the guard]."  *Id.*  Similarly, here, in addition to the pure passage of time – almost three

---

reported to MDOC officials on February 9, 2017."  (Doc. #49 at ¶26).

Similarly, Beasley avers that he overheard Galeski "having a sexual conversation with another prisoner" and "talking about me" with that other prisoner, and had asked him to stop.  (Doc. #47-10. at ¶¶12-16; *id.* at 8).  Beasley claims that Galeski continued "talking about me," and that because "it continued, I hit him."  (*Id.* at 10).  Beasley specifically avers that his altercation with Galeski on March 4, 2017, "had nothing to do with Galeski's fight with Prisoner Knight or any verbal altercation that took place [around the time Galeski submitted his kite protection request] on February 8, 2017."  (*Id.* at ¶14).  Beasley reiterated that that he hit Galeski only "because he was talking about me, not because of any event that occurred on or around February 8, 2017."  (*Id.* at ¶16).  Galeski avers that he never "harassed, degraded, threatened, or 'teased' . . . Mr. Beasley."  (Doc. #49 at 27, ¶24).  He also denies ever having "any sexual conversations through the cell doors," as Beasley claims to have overheard.  (*Id.* at ¶21).  Again, though, Galeski lacks a foundation to dispute Beasley's perception that Galeski had been talking about him, and that that was the reason for Beasley's actions.

weeks – the undisputed evidence is that Galeski did not raise any protection concerns or object (via filing a grievance or otherwise) to the removal of his in-cell status during that interim period. And, even after Knight's assault, Galeski did not seek protection from Beasley. As in *Stallworth*, then, Galeski cannot show that the removal of his in-cell status on February 9, 2017, was the proximate cause of the assaults against him on February 27, 2017 or March 4, 2017.

In sum, for all of the foregoing reasons, the Court finds that Galeski failed to raise a material question of fact as to the issue of causation, and that at most, he has presented "a mere scintilla of evidence" on that issue, which is insufficient to overcome summary judgment. Although Galeski argues, "... as I have listed witnesses I intend to produce at trial, its [sic] only fair that this court allow these claims to proceed to allow additional evidence through testimony regarding my claims, to be judge on at trial" (Doc. #49 at 20), that is simply not the law. *Alexander*, 576 F.3d at 558. Rather, after Defendants supported their motion with evidence establishing the absence of a material question of fact, it was Galeski's obligation to present sufficient competent evidence to overcome summary judgment. *Id.* Galeski cannot avoid his evidentiary obligation at the summary judgment stage simply by stating in his response brief that he will present more at trial.

## II. RECOMMENDATION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment **(Doc. #47)** be **GRANTED**.

Dated: July 31, 2019                        s/ David R. Grand
                                                    DAVID R. GRAND
                                                      United States Magistrate Judge

## REVIEW

Either party to this action may object to and seek review of this Report and Recommendation ("R&R"), but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed .R. Civ. P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   Filing objections that raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this R&R.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).   A copy of any objection must be served upon this Magistrate Judge.   E.D. Mich. L.R. 72.1(d)(2).

*Note these additional requirements at the direction of Judge Cleland:*

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this R&R to which it pertains.   Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.   The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 31, 2019.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager